UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-2407 JJO

UNITED STATES OF AMERICA

v.

MAIKEL JOSE MORENO PEREZ,

          Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?  ___ Yes  ✓ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?  ___ Yes  ✓ No

                Respectfully submitted,

                ARIANA FAJARDO ORSHAN
                UNITED STATES ATTORNEY

BY: _____
     MICHAEL N. BERGER
     ASSISTANT UNITED STATES ATTORNEY
     District Court No. A5501557
     99 N.E. 4th Street
     Miami, Florida 33132
     Tel:    305-961-9445
     Fax:   305-536-5321
     Email: michael.berger2@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Maikel Jose Moreno Perez,<br><br>_____<br>*Defendant(s)* | )<br>)<br>) Case No. 20- 2407 JJO<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____2012-2018_____ in the county of _____Miami-Dade_____ in the _____Southern_____ District of _____Florida_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to Commit Money Laundering Offenses |
| 18 U.S.C. § 1957 | Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Shauna Willard, Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____03/12/2020_____

_____
*Judge's signature*

City and state: _____Miami, Florida_____   John J. O'Sullivan, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Shauna L. Willard, being first duly sworn hereby depose and state as follows:

## INTRODUCTION

1. I am a Special Agent with Homeland Security Investigations ("HSI"). I have been employed with HSI for 16 years. I am currently assigned to a group that investigates Money Laundering, Bulk Cash Smuggling, and Fraud. I am a Certified Anti-Money Laundering Specialist under the Association of Certified Anti-Money Laundering Specialists. Moreover, I have conducted and participated in investigations of violations of United States laws relating to violations of financial laws, such as money laundering.

2. I make this affidavit in support of a criminal complaint charging Maikel Jose Moreno Perez with violations of Title 18, United States Code, Sections 1956(h) (conspiracy to commit money laundering) and 1957 (engaging in monetary transactions in property derived from specified unlawful activity).

3. The facts contained within this affidavit are both personally known by me, as well as relayed by others, including members of law enforcement and other witnesses. This affidavit sets forth only those facts that I believe are necessary to establish probable cause. As such, I have not included each and every fact known about this investigation.

## BACKGROUND

4. **Maikel Jose Moreno Perez** ("Moreno"), hereinafter referred to as the defendant, is the President of the Supreme Tribunal of Justice in Venezuela and has served in this role since in or around February 2017. Prior to this role, Moreno served various roles in the judiciary in Venezuela, including as head of the criminal division of Venezuela's highest court.

5.  **Co-conspirator 1** is a former criminal defense attorney in Venezuela that currently controls a media company in Venezuela.

6.  As noted by several independent agencies, Venezuela has suffered from extreme levels of corruption over the last several years. During that period, Transparency International ranked Venezuela as the most corrupt country in the Western Hemisphere. Similarly, the World Justice Project ranked Venezuela last among rated countries for rule of law, including last in the area of criminal justice.

### Investigation

7.  In late 2017, federal law enforcement opened an investigation into corruption at Venezuela's state-owned oil company—Petróleos de Venezuela, S.A. ("PDVSA")—and the laundering of proceeds of that corruption through bank accounts in Miami. Law enforcement identified almost $1 billion in transfers from PDVSA's subsidiaries to bank accounts of various Venezuelan contractors in South Florida. Based on witness interviews, the investigation revealed a substantial amount of money transferred from the contractors' accounts in Miami as bribes for the benefit of Venezuelan government officials. In virtually all instances, the contractors laundered the bribes through shell corporations or front persons to conceal and disguise the nature of the transaction and the true recipient of the bribes.

8.  The investigation also revealed extensive corruption within the Venezuelan criminal justice system where participants do not seek to resolve cases based on evidence; but, instead, look for "solutions" to cases by making bribe payments to prosecutors and judges.

### Defendant's Bank Accounts

9.  The United States has obtained defendant's bank records for multiple accounts held in the defendant's name at Bank of America in South Florida from 2012 through 2016. In or

around October 2014, the defendant told U.S. authorities in a visa application that he earned the equivalent of about $12,000 per year from his work in Venezuela.

10. From 2012 to 2016, the defendant's bank records show approximately $3 million in inflows to the defendant's accounts, primarily from large round-dollar transfers from shell corporations with foreign bank accounts linked to Co-Conspirator 1. For example, on or about April 23, 2013, the defendant received a wire transfer of approximately $500,000 from a Swiss bank account for a Panamanian company called Western Cape Holding ("Western Cape"). Similarly, on or about November 28, 2014, the defendant received a wire transfer of approximately $200,000 from an Austrian bank account for a Belizean company called Eaton Global Services Limited ("Eaton Global"). Based on bank records and witness statements, Co-Conspirator 1 controls both Western Cape and Eaton Global.[1]

11. From 2012 to 2016, the defendant's bank records show approximately $3 million in expenditures primarily in the geographical area of South Florida. For example, bank records show that the defendant paid approximately $1 million for a private aircraft and private pilot. Bank records show that the defendant spent more than $600,000 in credit or debit card purchases at stores primarily in the South Florida area (including tens of thousands of dollars at luxury stores in Bal Harbor, such as Prada and Salvatore Ferragamo), approximately $50,000 in payments to a luxury watch repair store in Aventura, and approximately $40,000 in payments to a Venezuelan beauty pageant director.

12. On or about May 18, 2017, the United States Department of Treasury placed the defendant on the Office of Foreign Asset Control sanctions list freezing his assets in the United

---

[1] Co-Conspirator 1 made other purchases for the benefit of the defendant. For example, in or around April 2017, Co-Conspirator 1 paid approximately $147,000 to a South Florida private jet company for the defendant's family to fly from Venezuela to Chile.

3

States because of a series of rulings by the Venezuelan Supreme court that stripped away authority from the elected legislature of Venezuela.

### Defendant's Judicial Corruption

13. The United States has obtained testimonial and documentary evidence from multiple witnesses detailing defendant's personal receipt of money and property as bribes to influence the outcome of civil and criminal cases in Venezuela over the last several years. As described by these witnesses, and corroborated by other sources, the defendant received the bribes in exchange for judicial actions, such as directing lower-court judges to release particular defendants or to dismiss particular cases.

14. Confidential Witness 1 ("CW1") is an associate of the defendant who has had extensive personal interactions with the defendant.[2] CW1 stated that the defendant received bribe payments for judicial actions in at least twenty different matters. CW1 stated that the defendant primarily received bribe payments in cash; however, Co-Conspirator 1, among others, also received bribe payments for the benefit of the defendant.

15. Confidential Witness 2 ("CW2") is an attorney in Venezuela who had personal interactions with the defendant.[3] CW2 stated that the defendant received bribe payments in at least three criminal matters involving CW2.

*Corruption in Civil Cases*

16. CW1 stated that the defendant received bribes in multiple matters to influence the outcome of civil cases in Venezuela.

---

[2] Law enforcement has debriefed CW1 on multiple occasions in the past and his/her information has proven reliable. Law enforcement has corroborated this information with independent witnesses and documentary evidence, including text messages.

[3] Law enforcement has debriefed CW2 on multiple occasions in the past and his/her information has proven reliable. Law enforcement has corroborated this information with independent witnesses and documentary evidence, including text messages and emails.

4

17. For example, CW1 explained that the defendant had involvement in a case involving certain Venezuelan auto dealers suing General Motors ("GM") in Venezuela. In or around April 2017, Venezuela seized GM's car assembly plant in Valencia pursuant to a seizure order relating to the auto dealers' case. The GM plant employed thousands of Venezuelans and had an estimated value of $100 million. As a result of the seizure, GM ceased operations and exited Venezuela.

18. CW1 confirmed that the defendant personally directed the issuance of the order relating to the seizure in the GM case. CW1 stated that, in exchange for the defendant's assistance, the defendant had an agreement with the attorney for the auto dealers to receive a significant percentage of the proceeds resulting from the sale of GM's plant.[4]

### *Corruption in Criminal Cases*

19. CW1 identified multiple criminal cases in Venezuela for which the defendant received bribe payments to resolve matters.

20. For example, CW1 explained that the defendant currently lives in a luxurious residence in the Alto Hatillo area in Caracas. CW1 stated that defendant received this residence as a gift from an individual charged in the United States with a multibillion dollar fraud scheme with PDVSA. CW1 stated that the defendant helped get the individual's case dismissed in Venezuela.[5] CW1 further stated that the defendant had an expensive watch collection at the residence, including at least one watch that costs at least a million dollars.

---

[4] To date, the current owners of the plant have not found a purchaser for the plant and, therefore, the defendant has not received his stake.

[5] Confidential Witness 3 ("CW3") is a confidant of the Attorney General of Venezuela. CW3 has been debriefed by U.S. law enforcement and his/her information has been proven reliable and been corroborated by independent witnesses. CW3 stated that he/she heard a conversation between the defendant's assistant and the Venezuelan Attorney General where the assistant requested that the Venezuelan prosecutor's office dismiss the case against this individual.

21. CW2 corroborated the corrupt actions of the defendant in criminal cases.[6] CW2 explained that he/she had a close relationship with the defendant's assistant and would frequently visit the defendant's office. On a daily basis, the defendant's assistant received a list of persons arrested in Venezuela with the charge against the arrestee. CW2 stated that the defendant's assistant highlighted financial crime cases (rather than drug or violent crime cases) for review with the defendant because these individuals could afford to make bribe payments to the defendant.

22. On at least one occasion, while in the office of the defendant's assistant in the Venezuelan Supreme Court, CW2 stated he/she observed the defendant speaking with the defendant's assistant by video phone chat and discussing a particular case. On this call, CW2 heard the defendant state that the case could be resolved for "fifty-thousand or one-hundred thousand dollars." CW2 understood that the defendant sought a personal payment of fifty-thousand or one-hundred thousand dollars for release of the individual from custody.

*Defendant's Receipt of a Bribe from Miami in November 2017*

23. CW1 and CW2 had direct knowledge of a case involving a bribe payment from Miami for the benefit of the defendant in connection with the proposed release of a PDVSA contractor ("Contractor 1") from custody.

24. CW2 represented Contractor 1 in Venezuela in connection with his/her detention on charges of alleged corruption involving PDVSA contracts.

---

[6] CW2 also had direct knowledge of corruption within the Venezuelan prosecutor's office. For example, CW2 explained that the Venezuelan prosecutor's office had an investigation of corruption involving a contractor who had contracts with PDVSA ("Contractor 2"). CW2 explained that, in early 2017, he/she arranged a private meeting at a residence in Venezuela between Contractor 2 and a Venezuelan prosecutor ("Prosecutor 1"). CW2 explained that, at this meeting, Contractor 2 and Prosecutor 1 negotiated an amount for the personal benefit of Prosecutor 1 to resolve the case against Contractor 2. During the meeting, Contractor 2 requested a lower amount to pay Prosecutor 1 because Contractor 2 stated that he/she knew many individuals at PDVSA that could pay bribes in the future to Prosecutor 1. Ultimately, Contractor 2 and Prosecutor 1 negotiated an agreement on a price of $1 million so that the Venezuelan prosecutor's office would not charge Contractor 2. CW2 helped arrange the payment of this bribe.

25. CW2 negotiated with the defendant's assistant and reached an agreement to pay $1 million for the personal benefit of the defendant to secure the release of Contractor 1 on house arrest.

26. CW1 had discussions with the defendant in the defendant's office in Venezuela where defendant agreed that he would receive the $1 million bribe payment by having the money directed for the purchase of a building in the commercial district of Las Mercedes in Caracas, Venezuela.

27. CW2 said that Contractor 2 agreed to make the payment of the $1 million bribe for the release of Contractor 1. From 2014 to 2017, Contractor 2 received over $100 million into his companies' bank accounts in Miami from inflated contracts with PDVSA subsidiaries. The United States has obtained substantial evidence—in the form of witness statements, bribe ledgers, and underlying contracts—that Contractor 2 obtained these inflated contracts by paying bribes to officials at the PDVSA subsidiaries in violation of Venezuelan law.

28. On or about November 17, 2017, Contractor 2 transferred approximately $1 million from a Bank of America account in Miami (that corruptly received funds from a PDVSA subsidiary) to a bank account belonging to an associate in Miami. On that same day, the associate of Contractor 2 transferred approximately $700,000 to a bank account in Puerto Rico controlled by the owner of the building in Las Mercedes.

29. CW2 provided wire transfer documentation that the remaining $300,000 payment came from a bank account in Panama to a bank account in Portugal belonging to the owner of the building in Las Mercedes.

30. The bank in Puerto Rico that received the $700,000 transfer raised questions about the source of the funds and requested supporting documentation to justify the transfer. CW2

provided copies of WhatsApp communications with an associate of the defendant regarding the additional documentation.

- Defendant's Associate to CW2 (December 4, 2017): "Brother the 700 are still frozen from the beneficiary account. They will release once all the required documents required by the bank have been completed . . . only thing missing are bank records from the Bank of America."

- CW2 to Defendant's Associate (December 4, 2017): "Brother it was already solicited. The reference from the bank and owner of the account is in Venezuela. They won't provide it online."

CW2 provided the government with copies of false and fraudulent loan documents used to justify the transfer of the funds for the $700,000 transfer to the bank. These documents falsely and fraudulently indicated that Contractor 2's associate had provided a loan; when, in truth and in fact, the money was not a loan. Instead, CW2 used the documents to conceal and disguise the nature of the transaction and the true recipient of the funds.

31. CW1 stated that, as a result of the $1 million dollar payment in this matter, the defendant currently owns the building in Las Mercedes through a nominee company and owner in Venezuela.

32. In or around early 2018, Contractor 1 had not been released from custody in Venezuela. CW2 went to the defendant's office in the Supreme Court of Venezuela. Upon entering the office, the defendant raised the volume of the television in his office. The defendant pointed down and indicated that he had received the bribe payment and that Contractor 1 would be released from detention.[7]

33. Based on the foregoing, I respectfully submit that there is probable cause to support the following criminal violations in the Southern District of Florida:

---

[7] Contractor 1 has not been released from custody in Venezuela. CW3 explained that the Venezuelan Attorney General would not agree to the release of Contractor 1 because of a personal animosity toward the family of Contractor 1.

8

- Between in or around 2012, through in or around 2018, the defendant did knowingly and willfully, that is, with the intent to further the object of the conspiracy, and knowingly conspire, confederate and agree with persons known and unknown, to knowingly engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000 such property having been derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

  It is further alleged that the specified unlawful activity is an offense against a foreign nation involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, all in violation of Title 18, United States Code, Section 1956(h).

- On or about November 17, 2017, the defendant did knowingly engage in a monetary transaction, by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, a $700,000 transfer from a bank account in Miami to a bank account in Puerto Rico, such property having been derived from specified unlawful activity, that is, offenses against a foreign nation, specifically Venezuela, involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, in violation of Title 18, United States Code, Sections 1957 and 2.

Further your affiant sayeth naught.

Shauna Willard
Special Agent, HSI

Sworn to and subscribed to before me this 12 day of March, 2020 in Miami, Florida.

John J. O'Sullivan
United States Magistrate Judge